# Staunton

## Spurgeon S. Rice, C. Wesley Lewis and A. C. Bishop v. Commonwealth of Virginia.

September 8, 1948.

Record No. 3393.

Present, All the Justices.

*Allen & Allen,* for the plaintiffs in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Special Assistant to the Attorney General,* for the Commonwealth.

STAPLES, J., delivered the opinion of the court.

The plaintiffs in error, defendants below, were found guilty by a jury and fined five dollars each in the Circuit Court of Nottoway County. They were charged with violating the following provisions of section 683 of the Code:

"Every parent, guardian, or other person in the Commonwealth, having control or charge of any child, or children, who have reached the seventh birthday and have not passed the sixteenth birthday, shall send such a child, or children, to a public school, or to a private, denominational or parochial school, or have such child or children taught by a tutor or teacher of qualification prescribed by the State Board of Education and approved by the division superintendent in a home, and such child, or children, shall regularly attend such school during the period of each year the public schools are in session and for the same number of days and hours per day as in the public schools."

No claim is made that the defendants complied with the statute. They contend, however, that they are excused from compliance therewith—first, because the children were given adequate instruction in their homes by their parents, and, second, because of the religious convictions of the parents as hereinafter set forth. They rely upon the First Amendment to the Constitution of the United States which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * * ." Since this prohibition is directed solely to

congressional action, it is obvious that it has no direct application to the State statutes here involved.

They also invoke the provision of the Fourteenth Amendment which prohibits any State from making or enforcing any law which shall deprive any person of life, liberty, or property, without due process of law, or deny him the equal protection of the laws.

The facts in the case, as certified by the judge of the circuit court, so far as we deem the same pertinent to the consideration of the questions here raised, are as follows:

"An investigation was made by the visiting teacher of Nottoway County, Virginia, and in each instance the parent or parents informed the visiting teacher that the respective child, or children, was not sent to school and would not be sent to school because of certain religious beliefs on the part of the parents; that the respective child or children received certain instructions in the respective homes by the parents; and such instruction did not cover the same number of days and hours per day as in the public schools.

"No effort has been made by the defendants to secure a tutor or teacher of qualification, prescribed by the State Board of Education, and approved by the division superintendent, nor have any of the defendants attempted to qualify as a tutor or teacher, prescribed by the State Board of Education and approved by the division superintendent, to teach in the home.

"The defendant, C. W. Lewis, is married, lives with his wife and children, in Nottoway County, Virginia, on a farm. He has six children, Elsie, a girl, twenty-five; Ora, a girl twenty-three; Garland, a boy, thirteen, Roscoe, a boy, eleven, Drexel, a boy eight, and Flossie, a girl, six.

"The defendant, Spurgeon Rice, is married lives with his wife on a farm in Nottoway County, Virginia, and is the father of Spurgeon Rice, Jr., nine years old.

"The defendant, A. C. Bishop, is married, lives with his wife on a farm in Nottoway County, Virginia, and is the father of four children of school age, Ola Mae Bishop,

sixteen, Fay Bishop, fourteen, and Bondoda Bishop, age twelve, Anna Belle Bishop, age 9.

"The three defendants own approximately twenty-five hundred (2500) acres of land. They are thrifty, law-abiding citizens, who were never accused of violating any law until accusations were made against them, charging them with violation of the compulsory education law.

"They are deeply religious. They hold religious services together where everybody can preach, pray, sing, and so forth, as the spirit moves them. They believe that the Bible, as the word of God, is the supreme authority; that the obligation imposed by the law of God is superior to that of the laws enacted by the temporal government.

"They interpret the Bible as commanding, at the risk of God's displeasure, that parents teach and train their children in the ways of life.

"The devoutness of their belief is such that they will willingly suffer persecution and punishment rather than send their children to public schools where they may be subjected to unwholesome influences, diseases, and so forth, and by means of which they will, in a measure, lose their control of their children and their right to bring them up according to the interpretation which they place upon the Bible as commanding them to teach and train their children.

"Sending their children to the public schools is incompatible with a primary religious obligation they feel that they owe to their maker.

"Their refusal to send their children to the public schools is based upon sincere religious grounds and is not in any sense with any defiant attitude with reference to the law, nor with any wilful intent to violate the law of the land, but solely because of their sincere religious convictions. To send them to the public schools would invoke conscientious scruples.

"They are ready and willing to obey all the laws which do not conflict with what they sincerely believe to be the higher commandments of God.

"Their convictions are religious, they are genuine and

their refusal to yield to compulsion of law is in good faith and with all sincerity.

"Each of the defendants teaches and educates his children in the home. The defendant, Lewis, among others, uses the following books in teaching his children:" Then follows a list of the textbooks used.

"The schedule in each of these homes daily is as follows:

"Scriptures
"Breakfast
"Chores
"Book lessons

"Chores
"Dinner
"Scriptures
"Book lessons

"Chores
"Supper
"Scriptures
"Book lessons.

"This schedule is followed in the summer as well as in the winter, every day in the week, four hours a day, excepting Sunday, which is reserved for worship only. One chapter of the Bible is read at each scripture period, three chapters a day, and this is done until the entire Bible is read, and then they begin reading it all over.

"The teaching in the home by the parents is continued until the children are educated sufficiently to enable them to make their own way in the world, generally until they become twenty-one years of age."

The facts certified also indicate that two of the grown daughters of defendant Lewis and one grown daughter of defendant Bishop have satisfactorily performed their duties of employment in certain business enterprises.

The defendants do not challenge the general validity of

the Virginia compulsory attendance law.[1]  It is its application to them, under the circumstances disclosed by the evidence in this case, of which they complain.  They argue that in the instant case the enforcement of the statute infringes upon their right to raise, instruct, and educate, their children as they see fit, provided the children are given proper education.

Section 683 of the Code gives the parent the option or privilege of sending the child "to a public school, or to a private, denominational or parochial school, *or have such child or children taught by a tutor or teacher of qualification prescribed by the State Board of Education and approved by the division superintendent in a home.*"  Thus the statute reserves to the State educational authorities the function of determining the qualifications of the tutor or teacher. The reasonableness of the qualifications for teachers or tutors in the home, which are prescribed by the State Board of Education, is not questioned.

The defendants assign as error the refusal of the court to give their requested instruction "C", which was as follows:

"The court further instructs the jury that if they believe from the evidence that the refusal of the defendants to send their children to the public schools is based upon sincere religious grounds and is not in any sense from any defiant attitude toward the law, nor with any wilful intent to violate the law, but solely because of their sincere religious convictions, the jury must find the defendants not guilty."

The effect of the instruction is to render the defendants immune from any obligation to comply with the statute because of their religious beliefs.  In support of the correctness of this proposition, defendants cite and discuss several decisions of the Supreme Court of the United States.

*Meyer* v. *State of Nebraska,* 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042, 29 A. L. R. 1446, is especially relied on.

---

[1] The validity of such statutes, as a proper exercise of the police power of the State, has been seldom questioned and always upheld except as to the specific provisions which have run afoul of certain well-established constitutional rights in their application to particular circumstances.

In that case a teacher was convicted under an information which charged that he unlawfully taught the subject of reading *in the German language.* This was admittedly in violation of the provisions of a statute of that State. Meyer challenged its validity as applied to him on the ground that as so applied it unreasonably infringed upon the liberty guaranteed to him by the Fourteenth Amendment. "No State shall * * * deprive any person of life, liberty, or property, without due process of law."

The Supreme Court held that the legislation, as applied to a teacher, was "arbitrary and without reasonable relation to any end within the competency of the State." The competency of the teacher was not challenged or in any way involved. But the following quotation from the *Meyer Case*, emphasizing the importance to children of having well qualified teachers is of particular interest:

"Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto. The calling always has been regarded as useful and honorable, essential, indeed, to the public welfare. Mere knowledge of the German language cannot reasonably be regarded as harmful. Heretofore it has been commonly looked upon as helpful and desirable. Plaintiff in error taught this language in school as part of his occupation. His right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the Amendment." (262 U. S. 390, 400).

The only question involved in the *Meyer Case* was the validity of a statute which prohibited the teaching of the German language. It is not claimed, however, that the statute here challenged prohibits the parents from teaching any subject they desire to their children. The only statutory question is whether they have stood the prescribed test to determine their qualification to teach so as to be relieved of the obligation to send them to school.

We cannot perceive that the principle decided in the *Meyer Case* has any application to the question of immunity from compliance with the statute because of religious beliefs.

*Pierce* v. *Society of Sisters, etc.,* 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070, 39 A. L. R. 468, is also relied on to support the position of the defendants. The Oregon Compulsory Education Act there challenged required all parents to send their children to a *public school* for a designated period of time. The Society of Sisters, a corporation, conducted a school with general educational instruction, and also religious and moral training, according to the tenets of the Roman Catholic Church, and had established a remunerative business. It secured a preliminary restraining order from a Federal district court enjoining the Governor and other officials of Oregon from enforcing the Act on the ground that it would work an irreparable injury to its business. In sustaining the injunction the Supreme Court said:

"No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." (268 U. S. 510, 534).

And the court concluded that the prohibition against attending any school other than a *"public school"* constituted an "arbitrary, unreasonable and unlawful interference with their patrons and the consequent destruction of their business and property."

We think the conclusion reached was obviously sound, but the principle supporting it is without any application to the case at bar. The Virginia statute expressly permits the sending of children to "a private, denominational or parochial school." The defendants here, however, claim the right to refrain from sending them to any school at all for religious reasons. No question of immunity from compliance with the statute on religious grounds was involved in the above case.

Defendants also rely upon an Oklahoma and two Mississippi cases.[1] We have given them careful consideration, but since the statutes, as well as the questions involved, are essentially different from those here presented, we do not consider them pertinent here. It will serve no good purpose, therefore, to enter into a discussion of them.

We think the power of the State to require the education and training of its children is well-established by the decisions.

In *Hamilton* v. *Regents*, 293 U. S. 245, 55 S. Ct. 197, 79 L. Ed. 343, the State statute required persons attending the University of California to take a course in military science and tactics. A number of the students refused to take such training for the reason that it violated their religious beliefs, scruples, and tenets, and they challenged the validity of the statute as applied to them. In holding their claim that the statute violated the Fourteenth Amendment untenable, Mr. Justice Butler, speaking for the court, had this to say:

"Undoubtedly every State has authority to train its able-bodied male citizens of suitable age appropriately to develop fitness, should any such duty be laid upon them, to serve in the United States army or in state militia * * *, or as members of local constabulary forces, or as officers needed effectively to police the State." (293 U. S. 260).

And the opinion continued:

"Taken on the basis of the facts alleged in the petition, appellants' contentions amount to no more than an assertion that the due process clause of the Fourteenth Amendment as a safeguard of 'liberty' confers the right to be students in the state university free from obligation to take military training as one of the conditions of attendance.

"Viewed in the light of our decisions that proposition must at once be put aside as untenable." (293 U. S. 262).

And in a concurring opinion Mr. Justice Cardozo pointed

[1] *Wright* v. *State*, 21 Okla. Crim. 430, 209 P. 179; *Bryant* v. *Brown*, 151 Miss. 398, 118 So. 184, 60 A. L. R. 1325; *Sinquefield* v. *Valentine*, 159 Miss. 144, 132 So. 81, 76 A. L. R. 238.

out the extremely illogical results which might follow from the application of a rule permitting a person to violate State laws on the ground of his religious scruples. He said:

"Manifestly a different doctrine would carry us to lengths that have never yet been dreamed of. The conscientious objector, if his liberties were to be thus extended, might refuse to contribute taxes in furtherance of a war, whether for attack or for defense, or in furtherance of any other end condemned by his conscience as irreligious or immoral. The right of private judgment has never yet been so exalted above the powers and the compulsion of the agencies of government. One who is a martyr to a principle—which may turn out in the end to be a delusion or an error—does not prove by his martyrdom that he has kept within the law." (293 U. S. 268).

The religious beliefs of the defendants in the case at bar do not exempt them from complying with the reasonable requirements of Virginia laws. The constitutional protection of religious freedom, while it insures religious equality, on the other hand does not provide immunity from compliance with reasonable civil requirements imposed by the State. The individual cannot be permitted, on religious grounds, to be the judge of his duty to obey the regulatory laws enacted by the State in the interests of the public welfare. The mere fact that such a claim of immunity is asserted because of religious convictions is not sufficient to establish its constitutional validity. Nor does the fact that defendants harbored no intent to commit a crime constitute a defense. The commission of the act, which is prohibited by statute, is sufficient to support the jury's verdict of guilty. *Bracy* v. *Commonwealth*, 119 Va. 867, 871, 89 S. E. 144. We find no error in the refusal of the instruction.

Defendants also assign as error the failure to give their requested Instruction B, which was as follows:

"The court further instructs the jury that if they believe from the evidence in this case that the failure of the defendants to send their children to school was due to a valid

reason and not to wilful defiance of the law, then the jury will find for the defendants."

It will be noted that the foregoing instruction does not undertake to advise the jury what, if any, may be considered valid reasons for failure of the defendants to send their children to school.

Section 684 of the Code contains this provision: "It shall be the duty of. the division superintendent, or the attendance officer, if one be employed, to investigate all cases of non-enrollment and, *when no valid reason is found therefor*, to notify the parent, * * * to require the attendance of such child."

The defendants contend that the words above underscored require the submission to the jury of the broad general question whether a "valid reason" did, in fact, exist. The preceding section, number 683, we think, sets out in detail all of the valid reasons of which the defendants could avail themselves for not sending their children to school under the circumstances of this case. These reasons are summarized and set forth in the Commonwealth's instruction which was granted by the court and was as follows:

"The Court instructs the jury that if you believe beyond reasonable doubt that the accused in this case had control or charge of any child, or children, who have reached the seventh birthday and have not passed the sixteenth birthday, which said child, or children, were not physically or mentally incapacitated for school work, nor suffering from contagious or infectious disease, and that public transportation is provided within one mile of the place where such children live, and that the accused failed to send such child, or children to a public school, or to a private, denominational or parochial school, or have such child, or children taught by a tutor or teacher of qualification prescribed by the State Board of Education and approved by the division superintendent in a home, then you should find the accused guilty and fix the punishment by fine not exceeding $500.00, or confinement in jail not exceeding twelve months, or both."

We think that by the foregoing instruction the jury was

properly advised as to the law applicable to this case, and that it was not error to refuse Instruction B offered by the defendants.

The defendants also insist that the evidence introduced by them was sufficient to submit to the jury the question whether their children were properly instructed in the home.

As we view the law of the case, the defendants had no standing in the circuit court to raise the question of the sufficiency of the teaching which they as parents were giving their children, as a defense to their wilful refusal to either send their children to school *or to have their qualifications as tutors or teachers in the home approved by the division superintendent of schools.* The statute provides that teachers in the home shall have the "qualification prescribed by the State Board of Education." The division superintendent is charged with the duty of determining whether a parent, desiring to act as a teacher or tutor for his children in the home, possesses such prescribed qualifications. The defendants made no effort whatsoever to comply with this requirement of the statute.

No claim is made that the prescribed qualifications are unreasonable, or that the superintendent failed to exercise proper judgment or discretion in passing upon their fitness. The defendants simply ignored this provision of the statute entirely.

Defendants challenge the requirement itself as not being a proper exercise of the police power of the State. They say it is not a reasonable regulation, even though designed to foster the education of children. We hold that it is.

In the first place, the legitimate interest of the State in the welfare and education of its children is universally recognized and, in fact, is not disputed by the defendants here. There is nothing which contributes more to the development of the highest type of citizenship than the intelligence, training, and character-building which are the products of our schools. It is, therefore, recognized by the authorities, without exception, so far as we can find, that

to accomplish this end the State may resort to what is generally referred to as compulsory education or school attendance of children. The question is ably discussed and the principal authorities reviewed in *Stephens* v. *Bongart* (1937), 15 N. J. Misc. 80, 189 A. 131. Supplementing the decisions therein referred to, additional ones are cited in the margin.[1]

In the second place, in order to impart an education to a child, it is self-evident that the instructor must himself have adequate learning and training in the art of teaching. Obviously, an illiterate parent cannot properly educate his child, nor can he, by attempting to do so, avoid his obligation to send it to school. No amount of religious fervor he may entertain in opposition to adequate instruction should be allowed to work a lifelong injury to his child. Nor should he, for this religious reason, be suffered to inflict another illiterate citizen on his community or his State. It is not and cannot be questioned that the parent should possess some learning and some training in the art of teaching. The defendants apparently concede the correctness of this proposition, because they introduced considerable evidence for the purpose of showing that their children were given proper instruction in the home.

The defendants claim the jury should be allowed to pass upon the question of the parents' qualifications. We cannot agree. We think it should be determined by competent agencies of the State upon whom has been placed the duty and responsibility of supervising the maintenance of a proper educational standard. Section 683, *supra*, charges the State Board of Education and the local division superintendents with this obligation. They are themselves required to be well-informed and well-versed in the field of education. They are undoubtedly much better equipped to pass upon a parent's qualification as a teacher than the ordinary laymen who comprise nearly all juries. In order to

---

[1] *Everson* v *Board of Education*, 133 N. J. L. 350, 44 A. (2d) 333, 337; *Parr* v. *State*, 117 Ohio St. 23, 157 N. E. 555, 556; *People* v. *Stanley*, 81 Colo. 276, 255 P. 610, 613; *State* v. *Williams*, 56 S. D. 370, 228 N. W. 470, 471; *State* v. *Hoyt*, 84 N. H. 38, 146 A. 170, 171.

appraise intelligently such qualifications, it is necessary to carry on an investigation into the experience, character, and ability of the parent as a teacher. This inquiry obviously cannot be conducted by a jury, the members of which are themselves not required to be qualified to teach or learned in the profession.

Since the defendants made no effort whatever to have their qualifications approved as required by the statute, they are in no position to interpose their instructional efforts as a defense to their clear and admitted violation of the statutory requirements.

The judgment of the circuit court is affirmed.

*Affirmed.*